I'm Stan Sloniker I'm Mr. Tsosie's lawyer. What we have is interrelated rulings by the substituted trial judge on well regarding two separate items both of which ultimately Mr. Tsosie sought an order continuing the trial because of the nature of them. The house in Red Valley, Red Valley by the way is north and east of Chinle. If you've ever been to Canyon de Chelly, it's beyond that. You've got to go over some mountains and it's out in a very picturesque area. We've got a map quest. Use Google Maps instead, it's better. Anyway, in the house in Red Valley, the government presented no evidence that there had been any fighting or bleeding or any other action in there other than that which was connected to Lorena Martin's death. Well, that was substantial bleeding and violence. It sure was. But the point is, is that WB1 that was found a year and a couple of months later came out of that same bedroom, the same frame with, you know, hand prints, drips, splatters, that's where it came from. Yes, the place had been wiped down, but the point- I know that, by the way, I just want to be sure I understand it. You keep referring to this WB1. Is that really the focus, this blood that was found in the bedroom, I think on the bed frame? Yes, that is the most clearly exculpatory evidence that existed because it was human blood. Was it dated to the same time as the finding of Martin's blood? Well, be quite honest, we didn't get any- Be quite honest. Be quite honest with me. Was it dated as at the same time of Martin's blood? I don't think so. I don't know that there was a date. It could have been there before Martin was hurt. It could have been there after Martin was hurt. Unlikely that it would have occurred after Martin's death because it had Martin's DNA in it, and it was blood. As to Martin's blood? Well, the sample is blood. It's a small sample. But as to the other blood, the blood of the unknown person, right, is there any foundational evidence proffered by your expert which places this blood sample as being applied at or about the time that Martin's blood was applied? We never got there, but I don't think it's possible. You know, I'm just telling you, I don't think my expert or anyone else could say- Whether it could be said or whether it could not be said, the fact of the matter is it was not said. No, we didn't get there because the judge didn't let us get there. Your proffer of evidence did not include the foundational and circumstantial fact that the blood of the unknown person was placed at or about the time that Martin's blood was placed there. True? That is true. All right. Thank you. And the blood WB1 was found sometime after this? Oh, yeah. A year and a couple of months. It was December of 08. We first indicated, well, at least in court, we first started talking about that on July 25th that made it to the record. And you can see that by August 29th, the judge, well, on the 25th, the judge said it was still unacceptable that many items of basic essential discovery, including the autopsy and certainly photos and other things, were not to Defendant Sosey's side. By the 29th, the lawyer or the Judge Campbell told the lawyers, I will leave it to you to continue working together regarding multiple items of disclosure and discovery, including entry to the home. Between that time and October 24th, there had been preliminary arrangements, including clearing schedules by the crime scene expert and counsel to get up there. And that had to be canceled when entry was not authorized by the family representative. That advisement was provided to the court, who addressed it on October 24th, said, I'm willing to help you get into the house in November or December. He used those words. In fact, Sosey's representatives were in the house on December 8th after working between the schedules, taking alternate power supply, lights, you know, all the stuff to get into a house that's out in the middle of nowhere that has no power. Can I ask you on page four of the supplemental letter brief of the state or the government? It says that, they say, the evidence was recovered from an unsecured crime scene over a year after the crime. The defendant's own analyst conceded the crime scene appeared to have been washed out, whatever that means, and was no longer in the same condition. Additionally, even if admissible, the evidence lacked probative value. The defendant proffered evidence that the evidence showed the DNA of someone other than him, and not excluding Randy or George. But there was no showing that the, I don't know how you pronounce this word, alleles were from the blood as opposed to cellular material. Well, here's the difference. Cellular material can be skin or hair or whatever. The point being, in that small sample, there was blood, and the primary DNA composition was that of the victim Lorena Martin. There were alleles, DNA fragments, that when you put them all together, you run them, you know, you look at, gee, we've got these alleles, what is the chance when we compare them to this person of it not being that person or of it being that person? The point being. But does it matter that it's not necessarily blood or some cellular material? No, no, because if there's a fight going on, you've seen the pictures, if there's a fight going on in that room, it's just as likely that the bleeding assailant will leave blood or will transfer blood along with that of the victim, or the victim's blood will contain some skin or other material from her assailant. That's why it's critical. Well, just telling us that other people were in the house isn't particularly significant. No, it's not telling you just that. It's telling you that other people are in the house, and another person's DNA is right in that small little drop of blood that contains the victim's. And she is dead, and there was a ton of other blood in there all over that area, including the frame. Big smear just to the right of it, drops right below. The blood's going to land on places that other people in the past have touched. I mean, that's part of it. I'm struggling here to try to figure out what the significance of this is. Well, I think it's important to know that what was submitted to the court wasn't itself evidence of anything, so much as it was evidence suggesting that there might be evidence that would be more probative of something. What's it probative of? It's probative of, I didn't do it, and one of the George brothers did it. That's the defense. And all he had were his drunken statements to the investigators in that regard, and, you know, a general argument that the FBI and the BIA investigators didn't do enough. You know, they didn't analyze any of the blood in the room, for example. They didn't analyze anything from any clothing. They didn't even seize her clothes. Well, okay, I'm trying to go back to what's being offered up to the judge. I've got this test that says there's somebody else's DNA there, and it is said, although I can't figure out what the basis for it is, that the somebody else isn't defendant. Correct. Okay, but knowing that other people in the house, what more of significance can be drawn from that? And even at this point, a year and some later, I don't understand, and I don't see what evidence is being offered as to what the significance of what this report is. I mean, is it just the first step down a long road that's going to have to be traveled, or does it really tell us something? I think it really tells us something in addition to the fact, What it tells us is that when Lorena Martin's blood was somehow deposited on that frame, in that spot, that, okay, somebody can make the argument that it went on top of the George brothers' skin, or that the George brothers came in later. It's not the George brothers. It's somebody. Right. It doesn't exclude the George brothers. Right. Somebody, but it doesn't exclude the George brothers like it does exclude Wilbert Sosey. That is a huge point when he's saying, I didn't do it. Okay? And then when you combine that with the jacket from a couple of weeks before that had been out in Neverland somewhere, either in New Mexico or in Flagstaff, awaiting consolidation, as we discussed with the trial judge, with Judge Campbell, on repeated occasions, and that's where that you'll still continue working together comment came from in August. And if you look even in December, counsel for the government had a few other things going on that kept him from being able to do an evidentiary hearing when we had originally scheduled it. We ended up, for the first time, the first time that anybody critically looked at that jacket was January 9th. If it's lack of diligence to defense counsel, okay. But it sure looks, I mean, after we saw it, it was pretty darn apparent. And if you look at those photos, there's a whole lot of blotches and smears and hair. So let me ask you this. Judge Clifton asked you about probative value. Yes. If you were arguing through the jury, after all, you don't have to prove that he's innocent. Right. What would you argue from all of this? The argument is. Ladies and gentlemen of the jury, and don't forget, this is not a case without any evidence of his culpability. Sure. But let's look at the scientific evidence. Let's look at what the hard evidence shows. It shows that Lorena Martin was beat up. It shows that she was bloodied. It shows that there was blood in that bedroom. But the only blood in that bedroom that we know was hers was mixed with someone else's, and we know that that person was not, that other person was not Wilbert Sose. Someone else's blood, but someone else's cells. Well, we don't know. But it was mixed with DNA of somebody else. It could have been some skin. Sure. And why do, if you, I mean, you know, the autopsy, they take skin. They scrape fingernails. Why do they do that? They're looking for evidence of the assailant, like from fighting, stuff like that. I'm at two and a half minutes. I'll take what is left. And we'll hear from the government. Thank you, and good morning. My name is Tom Simon, and I was the trial attorney for the United States in this case. Regarding the defendant's motion to continue, the district court did not abuse its discretion in denying that motion for a number of reasons. First, the defendant failed to establish that there was some relevant evidence of probative value with regard to further examination of the jacket at issue. In that regard, while there was circumstantial evidence that this jacket was the victim's, there was no evidence probative, no evidence. Wasn't there evidence that she had actually, had actually worn it at the time, and either someone put it on her or? There is some of that evidence, Your Honor. There is an individual who had stopped at the victim defendant's residence about, we think, about 7 o'clock at the date of her death. That individual went inside. The defendant was going back and forth acting very oddly and showing this individual there was blood in the bedroom and then showed the victim on the bed and asked this individual to help him, the defendant, take this jacket off the victim. That's Mrs. White? Pardon me? That's Mrs. White? No, this was a man named Jonathan Begay. He had come over earlier in the evening, Your Honor, and had just stopped by. He actually was looking for Randy and Alvin George, who had been there earlier in the day. And the defendant then asked him to help him, the defendant, take this jacket off the victim. But Jonathan acknowledged that he was intoxicated at the time. The lighting was very bad. The medical examiner testified that the victim had been kicked and stomped to death with such severity that she would have been unconscious from approximately 48 hours from the time that she was assaulted. Jonathan Begay came over probably about 6 or 7 o'clock. She died about 8.30, officially about 8.50 in the evening. So at the time, she would have been unconscious from already having been beaten, according to the medical examiner's testimony. With this evidence, can I start with two things? Would this evidence have been admissible? I'm sorry, Your Honor. Would this evidence that was suppressed, that the judge would not allow in as a sanction because of so-called discovery violations, would it have been admissible? The evidence was, and the jacket was admissible. The defense was requesting the opportunity to have the jacket further examined for other evidence of Randy and Elvin George's involvement with regard to this crime. That certainly would have been relevant. But what I was referring to was the WB-1, which counsel had been focusing on. Well, and I would offer as to both the WB-1 and the jacket, that if actually Randy and Elvin George had been invited by the defendant and the victim to spend time at their residence, in the three consecutive days they had been in the victim and defendant's residence prior to the victim's murdering, the residence of the victim is where she was murdered. I'm asking you a simple question that requires a yes or a no answer. Would it have been admissible? The evidence that the judge excluded, for example, WB-1, would that have been admissible? If he hadn't excluded it because of discovery violations. It's my position, Your Honor, that there was foundational concerns to establish the reliability of that evidence. And as the Court is well aware, in October of 2010, October 7, 2010, the crime scene was completed and the integrity of that crime scene was lost as far as the government is concerned. It wasn't until December. Well, he didn't do it. I mean, the question is, I mean, he, the defense didn't do that. Those are arguments you could make. The question I have is would it have been admissible? It only requires a yes or a no answer. No. So you would be entitled to win on that ground even if the judge's decision was wrong in imposing a sanction for not complying with discovery. Is that your argument? That is one of the arguments, Your Honor, foundationally, that I believe that the evidence, it was so unreliable it didn't meet that threshold under the Daubert. So based on that, I would have argued that it would not be reliable evidence. But there was no Daubert hearing. Pardon me? There was no Daubert hearing. It had never been, you know, we don't know what the outcome of the Daubert hearing would have shown. There was no hearing. That's correct, Your Honor. Why would it be unreliable under Daubert? I mean, it isn't the science that's in question. It's the question of when the other DNA was deposited. And I agree. And I don't question at all the Daubert with regard to the DNA. But it was my position that there was a threshold requirement of reliability. And because the scene had been so changed. Well, reliability as to what? I take it it's not reliability as to the science. It is not reliability to the science. It's a threshold to get to the science, to the opinion of the DNA expert and what they're relying on. And the threshold question is, you know, what are you relying on? And the concern here is in October of 2010, the scene had been completed. In December of 2011, the defense went to get this piece of W whatever it is, WC. UB1. Doesn't that go to more of a relevance question? That is, there's an alternative. There are lots of alternative explanations to how somebody else's DNA could have been there. It could have been deposited before. It could have been deposited after and so on and so forth. But that doesn't go to any of the scientific elements. And so are you saying the judge could have denied admission based on relevance? Relevance and foundation, yes, Your Honor. Well, foundation, I mean, foundation as to what? There's no doubt that the sample was collected. It was collected. It was collected well after the crime took place and from an unsecured location. But it was what it was. And so foundation is, it sounds to me foundation in this case is another word for relevance. Relevance is certainly, Your Honor, I would argue, as I was going to offer, that Randy and Elvin George had spent that time three consecutive days at the defendant victim's residence. And their hair, their fibers from their clothing, their DNA would have been throughout the interior of that residence. So to examine the jacket and find DNA, their hair, fibers from their clothing on that jacket would have been absolutely worthless as far as relevance. It provided no probative value. Again, what about the WB-1? You keep going back to the jacket. He's focusing on the WB-1. We've got to try not to be confused here. The WB-1 was found on the bed frame. And I would offer the same thing, Your Honor. I mean, Randy and Elvin George were, again, in that residence for three consecutive days. That's not in dispute. Their DNA would have been throughout the interior of the residence or the victim's blood to be there in their DNA. There's no showing that the DNA would have degraded to the point from the time that Randy and Elvin George would have left it there. So to find it there would have provided no probative value of any evidence. The question is whether it would have been admissible, whether it would have provided him with a basis to argue. I mean, you know, we deal in a system here where the defendant doesn't have to prove that he's innocent, where he can argue the government hasn't proved its case beyond a reasonable doubt and look at the so-called holes in the government's case. And so that's where it arguably comes in. And what arguments to be cynical about it is what smoke could he have blown in the jury's face, which is what Justice Wyden, I think in his concurring or dissenting opinion, Wade said was a lawyer's obligation, a defense lawyer's obligation to even try and get somebody, a defendant, off even if he was guilty. And would that have been, would that have provided him with smoke to blow in the jury's face? And, you know, I've seen juries do strange things. So have I, but the question is what it is. Yes, and I understand what the court is offering, but the response I would simply make is so irrelevant and the relevancy there is that the DNA was throughout the residence. And what is the defendant going to argue? He's going to argue, A, it wasn't the defendant's, but if he argues these points. What basis did you offer for the judge to exclude it? I'm talking now about WB1 so that we don't have any confusion. The court, excuse me, the court, I asked for a. You asked for the trial court to preclude the admission of it. Well, I asked. Or provide some other remedy. That's correct. I asked for an appropriate remedy under the circumstances. And the court determined basically on two factors. One, with regard to the favor to provide adequate notice and that the defense had the opportunity on a prior occasion to collect or review the area in question, defendant and victim's residence. I had provided the defense counsel in August 3rd with the name and the phone number of the person who was responsible for the residence. That was the victim's sister. And the court looked in the examination of the residence. So what difference does the time make? I mean, as to the admission of that evidence, that certainly speaks to the possibility of denying continuance. But, okay, it comes up late. But if you discover the night before you've got compelling evidence that somebody else did the crime, you know, Perry Mason, somebody jumps up in the back and confesses, you don't exclude it because it came up so late. So how can exclusion of evidence be justified based on it came up late if, in fact, there's no sign the defendant knew about it earlier? Well, the court excluded on not only the failure to conduct the appropriate discovery with regard to the particular blood spot, but the court also determined that the notice provided by the defendant under Rule 16 was not appropriate. Well, could I ask you, in his supplemental letter that he filed in response to our request, he quotes from a proceeding that occurred on October 24, 2011, after the defendant's lawyer said that there's blood spatter in the Red Valley, seeing these various items still awaiting consolidation by the government and examination by the parties may still have a bearing on my client's defense. I didn't do it. He quotes the trial judge as saying, trial court stated his willingness, and quote, to enter any appropriate orders to get you in so that you can get the crime scene investigated in the month of November or December so you'll be ready to go in January. So that assumes that the judge understood that it wasn't going to be until November or December that he can get the crime scene investigated, and it was in early January that he actually, on January 18th, he gave this information to you. Does that seem to support some, and a lot of these continuances, I think four or five of them were in your request in any event, or you joined in them. Is that indicative of a record of kind of a willful disregard of discovery orders? And I don't, it's not my position that the defense counsel willfully attempted to disregard discovery orders in this case, Your Honor. But doesn't that quote that he has reflect an acknowledgment by the court that he could get the, he might be able to get the crime scene investigated in the month of November or December? I mean, and by mid-January he hands you the report. How much, what would you have done, by the way, if you would have gotten it a month earlier? Well, hopefully then I would have the opportunity to respond to it when I received it. I know, but you were making all these wonderful responses to it. I mean, what more would you have done? I would have requested my own, and as I did in this case, I contacted my DNA expert, the DNA expert that I had noticed, and asked them, can we do anything with this by the time trial starts on Monday morning? And I was advised, even on an expedited basis, it would be 30 to 60 days before they would have any type of analysis and report. And at that point in time, I was left with no alternative but to file something with the court, and I did file that motion to limit a request from the court and appropriate remedy, because I had no opportunity to respond and I had no knowledge. Thank you. But doesn't that get us to the standard for when it's appropriate to suppress or exclude evidence because of a failure to comply with the discovery? And what is that standard? I mean, that's what we asked you to address in the letter. Correct. And with regard to the Finley case, and I recognize that, one, the difference in Finley is that the defendant had provided the prosecution with a timely notice. The prosecution then argued that the notice, when the expert testified, that the expert testified supplementarily or to information which was not contained in the notice, and there was then the objection, and the court reviewed that circumstance, determined that the government was correct. Here, the information was not timely provided to the government. But isn't there an issue of whether it was timely or not, given the statement of the judge that, I'll get you, in response to the defense lawyer's claim that there's blood spattered somewhere in the Red Valley scene, these various things, I don't know what, still awaiting consolidation by the government and examination by the parties. What does that mean? They have a bearing on the client's defense if I didn't do it, and the judge says, well, I'll get you in there by November or December. So if he gets in there by November or December, and it takes something like 30 days, assuming his expert needs as much time as yours, it seems to me to be timely. It may not be timely in terms of the convenience of the court, but it doesn't seem to me to be untimely in terms of finding any kind of willful discovery violation. And I think the court, the trial court, the actual trial court, was looking at the totality of the circumstances and the history of the case and determined that it, in its opinion, that it was not timely in the presentation in which it was made. And that was in the morning of the trial when there was 40 to 50, maybe 60 potential jurors from the northern part of the state of Arizona waiting to be selected to hear the case. I'm sorry, does the court have any further questions of me in that regard? I mean, the defendant didn't take the stand in this case, did he? The defendant did not take the stand. Does he have a prior record? Does he have any reason for not taking the stand? He did not have a prior record with regard to prior felony convictions, as I recall. But I think that he had made so many inconsistent statements and ultimately his statement that he may have done this, but he was so intoxicated that he just simply couldn't remember whether he had or not. It was my impression that he didn't want to take the stand and subject himself to cross-examination, having made that plethora of inconsistent statements during the course of the investigation. Any other questions? Thank you. Thank you very much. On January 9, 2012, the lawyers in Weaver-Barkman examined that jacket. The motion that followed noted that the interest of justice required continuance of trial to allow extensive multiple forms of testing, and that the argument was reiterated in a very short form in Mr. Sossi's response to the combined response to the motions in Limine, which sought preclusion solely on the basis of late disclosure. The late disclosure was January 18, five days before trial. It was close to trial. There's no doubt that the motion was reiterated. But that was roughly five weeks after collection, three weeks after authorization of payment. The item had already been transferred to Chromosomal Labs. Weaver-Barkman was the expert who collected it. He was not the analyst. The only report that was being discussed at that moment was the Chromosomal Lab report telling what its determinations were in terms of the alleles found in the sample. We didn't get to the foundation. We didn't have an argument that there wasn't foundation. Can I ask you? Yes. Maybe just I hate to keep diverting you, and maybe Judge Clifton will be, as an act of grace, give you a little more time. But in terms of the, and I want to turn to the harmless error argument, there was significant evidence that he did it. I don't question that you had, if this evidence had come in, that you could have blown smoke in the eyes of the jury. So you have a fairly strong government case. He does not testify. I'm not drawing any inference from the fact that he didn't testify. But I look at it as a scale. This is the government evidence. The scale goes up. This is the defendant's evidence, next to nothing, even with your stuff coming in. Why can't we say that this was harmless error? Well, you can't say, because you have to say it's harmless beyond a reasonable doubt. And you have Wilbert Soce not testifying in light of the evidence that had come in and not come in. That decision is not an ironclad one cast in stone. I'm not drawing any inference from it. I'm just saying that this is the government's evidence, and let's make this a pile. And this is the defendant's evidence. And this is a pile, which is almost nothing. I'm not drawing any inference. I'm just saying that this is what the defendant's evidence was. It would be different if he came in and told a coherent story. Then the scales may balance, and you have a possibility of prejudicial error. With all due respect, the ability to- I mean, I found a lot on his socks. He got rid of the shoes that he was wearing after the neighbor had said that those were your shoe marks on her face. He got rid of it. It showed consciousness of guilt. He was there. He was there. And even if you discount the statements that he made because he was drunk, I don't put much weight into, well, I'm so drunk, who knows what I could have done. It seems to me like it's an awfully strong case. It was a fairly strong case. The shoe, remember, was in an area that the investigators had looked over the night before, and they didn't see it. Well, but they found it whenever they did. But the significant thing is not when they found it, but that he had obviously taken the shoe off, and he was wearing a different pair of shoes, at least according to the testimony of the neighbor. Well, sure. But with other evidence, maybe he testifies and says, I never had anything on but those white shoes. The point is this. But he can't say that because the neighbor is the witness to that. Well, of course he can say that. Well, sure. I mean, and but the convincing nature changes when you have no testing for DNA or otherwise on the massive amounts of fluids in that room. One test from that room shows victim and someone else not Wilbert Sose. That's what makes it a decisive game changer. And if you don't have willfulness and there's no tactical advantage, if the lawyers have been trying to get this stuff put together and you have decisively valuable information excluding it. But let's focus on exactly that. You call this a game changer. Yes. I can't figure how probative it is. All it tells us is that somebody other than defendant was in the house. But we can't and at some point deposited some form of DNA on the same surface that blood was deposited. In that same extremely small surface. There's a lot of places. Is that the only place that was tested? Is that the only place where a blood sample was taken? That was the only place. I can't believe that. I'm sorry. That was the only place that a blood sample was taken by Mr. Sose. None of the blood in bedroom two was tested. That's what I'm telling you. That's what is so unbelievable. And so when you had the opportunity to test, you tested one location? No, I didn't. Not you. Defendant. When defendant's representative had the opportunity to inspect, that's all they inspected? That's all that was left. We didn't get in until December of 2011. And you could see the place was, you know, it wasn't clean. But it had been wiped. Okay? It looked like either bleach or TSP or something like that. That's all that was left in there in December. The government took pictures. They took some swabs, maybe eight, ten. That's it. And the record reflects that. I mean, that's what Timmy Smiley said. I only submitted, you know, these. And we didn't submit them for analysis. I mean, we put them into evidence, you know, put them into our evidence locker, and that's where they sat. Were they ever analyzed? Not to my knowledge. Did defense ever seek to analyze it? Nope. We were waiting, quite frankly, to see what we learned in the house and what the other evidence revealed. And that's why the jacket and WB-1 were so critical. Thank you. Thank you. We thank both counsel for your helpful arguments. This case and all the other cases argued today are submitted. We're adjourned. Thank you.
judges: Korman, Clifton, Bea